# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEREK S. JETER, TURN 2 ENTERPRISES, LLC, and DEREK S. JETER 2002 TRUST, | ) ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) ) | |
| v. | ) ) | C.A. No. 11706-VCG |
| REVOLUTIONWEAR, INC., | ) ) ) | |
| Defendant/ Counterclaimant. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: April 21, 2016
Date Decided: July 19, 2016

David J. Teklits, Kevin M. Coen, and Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; OF COUNSEL: Edward H. Tillinghast, III, Rena Andoh, and Brian B. Garrett, of SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, New York, NY, *Attorneys for Plaintiff/Counterclaim-Defendant*.

Marc S. Casarino, of WHITE AND WILLIAMS LLP, Wilmington, DE; OF COUNSEL: Joseph Tacopina and Matthew G. DeOreo, of TACOPINA & SEIGEL, New York, NY, *Attorneys for Defendant/Counterclaimant*.

GLASSCOCK, Vice Chancellor

This case provides a cautionary tale of the mixing of roles in a corporate-governance setting. The Defendant and Counterclaimant is RevolutionWear, Inc. ("RWI" or the "Company"), manufacturer of a high-technology undergarment, which it distributes under the FRIGO® brand ("FRIGO").[1] The Company wished to use the marketing power of the endorsement of a well-known athlete, Derek Jeter,[2] to enhance sales of FRIGO. Instead of negotiating with Jeter for the right to use his likeness, or hiring his services to promote FRIGO, RWI pursued a different strategy: it negotiated to bring Jeter into the Company as an owner and member of the board of directors, so that it could indirectly point to his involvement in a way that, presumably, RWI thought would appear more sincere to the underpants-buying public than would a standard paid endorsement. Jeter and RWI entered a director's agreement, which imposed contractual duties on the parties and made Jeter a fiduciary for RWI. I understand, in light of the counterclaims, that RWI had little or no interest in Jeter's stewardship of the Company; the arrangement was seen by RWI as a marketing ploy. In furtherance of that interest, RWI alleges that it required certain representations from Jeter: that he would consent to public promotion of the fact that he was a director, investor in, and "founder" of RWI, and that such would not conflict with a promotional contract Jeter had with the Nike sportswear

---

[1] Specifically, RWI distributes a product known colloquially as "underpants" or "underdrawers."
[2] As the reader is probably aware, Jeter played shortstop for the New York Yankees baseball team.

company.  Jeter and his agents, according to RWI, made such representations, which were material to RWI entering the director's agreement, and on which representations RWI relied in creating and funding a marketing strategy.  Jeter also made similar representations to investors on behalf of RWI.  According to the counterclaims, however, Jeter's representations were false:  either he misrepresented the Nike contract or for other reasons was unwilling to allow RWI to publicize his involvement with the Company.  Jeter also attempted to influence Company decisions; in other words, he acted like a "real" board member, but for allegedly self-serving reasons.  The counterclaims, accordingly, seek to impose damages for fraud and breach of contract, as well as breach of fiduciary duty.  Jeter has moved to dismiss the counterclaims; the results are mixed.  My reasoning follows.

## I. BACKGROUND[3]

*A. The Parties*

Defendant and Counterclaimant RWI is a Delaware corporation headquartered in New York, New York.[4]  Incorporated in 2010,[5] RWI is a men's clothing company that develops and markets men's undergarments under the FRIGO brand.[6]

---

[3] The facts are drawn from the Counterclaimant's Amended Answer to the Verified Amended Complaint and Counterclaims (the "Counterclaims" or "Countercls.") and are presumed true for purposes of evaluating the Counterclaim-Defendant's motion to dismiss.
[4] Countercls. ¶ 26.
[5] *Id.* at ¶ 66.
[6] *Id.* at ¶ 28.

Plaintiff and Counterclaim-Defendant Derek S. Jeter is a former professional baseball player and a stockholder, noteholder, and former director of RWI.[7] By at least March 2011, and at all relevant times thereafter, Jeter owned 15% of the Company.[8]

*B. Jeter Joins RWI and Agrees to Publically Announce His Role*

RWI targets consumers using a unique marketing strategy that it refers to by the odd misnomer "reverse-endorsement."[9] "Reverse-endorsement" is a concept in which celebrities and famous athletes join the Company as "significant owners, directors, advisers and founders," rather than simply endorsing or promoting the product.[10] RWI believes that "consumers [are] more impressed if a well-respected celebrity or famous athlete [is] actually part of the business, [as] a board member, [and] co-founder and invest[s] his/her own money, time and effort into the company."[11]

In 2009, after learning of RWI's FRIGO undergarment product and its reverse-endorsement strategy, David VanEgmond, Jeter's financial and tax adviser, and Casey Close, Jeter's sports agent, met with a group of RWI representatives,

---

[7] *Id.* at ¶¶ 27, 29.  Although the Plaintiffs' Amended Complaint, filed November 25, 2011 (the "Complaint" or "Compl."), refers to Turn 2 Enterprises, LLC and Derek S. Jeter 2002 Trust as Plaintiffs, neither party is identified in the Counterclaims.  Therefore, while I list those parties in the caption, I refer to Jeter as the Plaintiff throughout this Memorandum Opinion.

[8] *Id.* at ¶ 149.

[9] *Id.* at ¶¶ 41–43.

[10] *Id.*

[11] *Id.* at ¶ 42.

including Mathias Ingvarsson, a co-founder of the Company and its eventual Chairman and CEO, to discuss Jeter's potential involvement with RWI.[12] Later, after Ingvarsson sent Jeter samples of FRIGO products, Jeter requested a meeting with Ingvarsson.[13] On February 17, 2010, Ingvarsson and the RWI team met with Jeter, VanEgmond, and Close.[14] At the meeting, the RWI team made a presentation to Jeter which outlined Jeter's possible involvement with FRIGO.[15] Among other things, the presentation stressed the value of Jeter's potential "high profile involvement" in the Company and indicated that Jeter would make media appearances to discuss FRIGO as a "substantial owner, co-founder and director" of RWI.[16]

Shortly after the presentation, Jeter's representatives contacted RWI to express Jeter's interest in joining the Company.[17] At that time, Jeter was under contract with Nike, a relationship Jeter considered "incredibly important."[18] Accordingly, Jeter's representatives stated that he would need to obtain permission from Nike to become a "publically announced co-founder, substantial owner and director" of RWI.[19] Recognizing the importance of Jeter's relationship with Nike,

---

[12] *Id.* at ¶¶ 45–50.
[13] *Id.* at ¶¶ 51–52.
[14] *Id.* at ¶ 53.
[15] *Id.*
[16] *Id.* at ¶¶ 54–56.
[17] *Id.* at ¶ 57.
[18] *Id.* at ¶¶ 59–60.
[19] *Id.* at ¶ 59.

4

RWI requested a copy of the Nike contract and any carve-out related to Jeter serving as a "director, co-founder and significant owner" of RWI.[20] Jeter's representatives,[21] however, refused to provide Jeter's Nike contract, stating that the contract was confidential.[22] Instead, Jeter's agents represented that Jeter's impending relationship with RWI was "carved-out" in his Nike contract. During a telephone conversation on or about February 17, 2011 between VanEgmond, Ingvarsson, and RWI officer Kinda Younes, VanEgmond stated that the language in the carve-out "was in accordance with what RWI requested and wished to accomplish with Jeter."[23] In addition, VanEgmond represented that Jeter had received Nike's written permission to be a "publically announced co-founder, substantial owner and director" of RWI.[24]

On March 23, 2011, based partly on Jeter's representations concerning his Nike contract, Jeter and RWI executed a Memorandum of Agreement for Service upon the Board of Directors (the "Director Agreement").[25] Two provisions in the Director Agreement are pertinent to the reverse-endorsement strategy at issues here.

---

[20] *Id.* at ¶ 63.
[21] I generally refer to David VanEgmond, Jeter's financial and tax adviser, and Casey Close, Jeter's sports agent, as Jeter's "representatives" or "agents."
[22] Countercls. ¶ 63.
[23] *Id.*
[24] *Id.* at ¶¶ 66–67. It is unclear from the Counterclaims whether VanEgmond spoke to Ingvarsson and Younes individually in separate calls or whether VanEgmond spoke with Ingvarsson and Younes together on a single joint call.
[25] The Director Agreement is not attached to the Counterclaims, but is attached to the Plaintiff's Complaint. *See* Compl., Ex. B ("Director Agreement"). The Counterclaimant refers to the Director Agreement in its pleadings. Countercls. ¶ 73. I find that the Director Agreement is integral to the Counterclaims and I therefore consider it as part of my analysis of the motion here. *See Orman v. Cullman*, 794 A.2d 5, 15 (Del. Ch. 2002).

First, Section Seven of the Director Agreement provides, in part, that "RevolutionWear may disclose the identity, and a brief biographical sketch, of the Director in the context of information about [] RevolutionWear's management or otherwise."[26] Second, Exhibit E of the Director Agreement, titled "Specific Services to be Provided by Director," provides that "RevolutionWear may issue a press release disclosing [the] Director's role with RevolutionWear *provided* that Director approves the press release in advance."[27] Therefore, despite RWI's ability to unilaterally disclose Jeter's identity "in the context of information about [RWI's] management," the Company's ability to issue a formal press release is dependent on Jeter's approval in advance.

A third provision is important here: notwithstanding the provisions governing the disclosure of Jeter's role with the Company, the Director Agreement specifically excludes the obligation that Jeter endorse the product. Section Six of the Director Agreement states, in part, that Jeter's "services to RevolutionWear under this Agreement do not include endorsement or marketing RevolutionWear's products or the use of [Jeter's] likeness or name in connection with the marketing of RevolutionWear's products."[28]

In return for the obligations imposed on Jeter in the Director Agreement, Jeter

---

[26] Director Agreement § 7.
[27] *Id.*, Ex. E (emphasis added).
[28] *Id.* § 6.

received, among other things, non-qualified stock options to purchase shares in the Company.[29]

Months after executing the Director Agreement, Jeter's agents continued to represent that Jeter's Nike contract did not conflict with the "reverse-endorsement" strategy envisioned by RWI. In a September 15, 2011 meeting with Ingvarsson and other RWI officials, Close purported to "read"—that is, orally quote verbatim—the carve-out from the Nike contract that was, as RWI explains, consistent with VanEgmond's earlier statement on February 17.[30] Based on that representation, RWI continued to believe that Jeter could publically announce that he was a director, co-founder, and significant owner of the Company.

*C. Jeter Refuses to Announce His Role with RWI*

Once he became an investor and director of RWI, the Counterclaimant contends that Jeter began to influence the direction of the FRIGO product by threatening to withhold the pledged public announcement of his role with the Company. In or about November 2012, Jeter told RWI that he could not publically announce his role with RWI unless it changed the FRIGO product from a "sports undergarment" to a "fashion undergarment."[31] As RWI explains, Jeter feared that if

---

[29] *Id.* § 3.
[30] Countercls. ¶ 63.
[31] *Id.* at ¶ 77. It is not clear whether such a reformulation required a change in high-tech underdrawer technology, or simply to the marketing of the product.

7

the product was too "sporty," it would upset and damage his relationship with Nike.[32] In order to preserve its relationship with Jeter, therefore, RWI "invested substantial funds into redesigning the message, packaging and product line, and changed the distribution plan, to make the product less 'sporty/athletic.'"[33]

Nonetheless, RWI continued to pursue its "reverse-endorsement" strategy with Jeter. Jeter, however, repeatedly "refused to allow" RWI to publically announce that he was a "co-founder, substantial owner and director."[34] Although RWI had a contractual right to disclose this information without Jeter's permission in accordance with the Director Agreement, it allegedly demurred in the hope of maintaining a good relationship with Jeter; it therefore sought his approval.[35]

Finally, on November 13, 2013, Close informed Ingvarsson via email that, due to Jeter's Nike contract, "there will be no mention of Derek's presence in the marketplace."[36] Close's email, according to RWI, revealed for the first time that Jeter's prior representations relating to his Nike contract were false and misleading.[37] Until Close's email, RWI alleges that it was unaware and could not discover the falsity of those representations because Jeter's representatives refused to give RWI

---

[32] *Id.*
[33] *Id.* at ¶ 78.
[34] *Id.* at ¶ 69.
[35] *Id.* at ¶ 79. Presumably, RWI refers to the contractual right provided in Section Seven of the Director Agreement that allows RWI to "disclose the identity, and a brief biological sketch, of the Director." Director Agreement § 7.
[36] Countercls. ¶ 69.
[37] *Id.* at ¶ 70.

8

access to the terms of the Nike contract.[38]

The Counterclaimant points to later communications that solidified Jeter's refusal to publicly disclose his role with the Company. Following a July 2014 article in the New York Post naming Jeter an "owner" of RWI, Close sent an email to Ingvarsson in which he objected to the publication of Jeter's role, characterizing any mention of Jeter as an owner of RWI as "improper."[39] Specifically, Close stated that "[w]e don't speak about it"—referring to Jeter's role at RWI.[40]

Months later, in September 2014, Jeter refused to approve a formal press release announcing that he was a co-founder, significant owner, and director of RWI.[41] Instead, Jeter allowed a statement expressing his "excitement" about the product and that he looked forward to seeing its continued progress.[42] Notably, in an email following the press release, VanEgmond explained that "[i]f Derek wants to be a silent investor at this point, let him."[43] Finally, following a December 2014 report by "Crain's"[44] that characterized Jeter as an RWI "investor," Jeter's representatives demanded that RWI halt further press releases discussing Jeter's role.[45]

---

[38] *Id.* at ¶ 80.
[39] *Id.* at ¶ 130.
[40] *Id.*
[41] *Id.* at ¶¶ 131–32.
[42] *Id.* at ¶¶ 132–33.
[43] *Id.* at ¶ 134.
[44] The Complaint does not define the report, or article, published by Crain's.
[45] Countercls. ¶¶ 138–39.

*D. Jeter's Misrepresentations to Investors*

While the Counterclaims focus mostly on Jeter's representations to the Company, RWI also identifies instances in which Jeter falsely represented to investors that he would publicly announce that he was a "co-founder, substantial owner and director" of RWI. Specifically, RWI alleges that Jeter made such false representations to investors in Sweden in November 2011, as well as to investors in Tampa, Florida in January 2012.[46] Moreover, in a September 2012 video shot to show to RWI investors and retailers, Jeter stated that he was "involved in this business as an investor, entrepreneurial co-founder [and] Board Member."[47] Jeter's statements in the video, according to RWI, strengthened investor belief that Jeter would publically announce his role with the Company pursuant to its reverse-endorsement campaign.[48]

Following the video, on January 25, 2013, Jeter attended an RWI "marketing and investor" meeting in Stockholm.[49] At the meeting, Jeter represented to Ingvarsson, RWI's marketing team, and investors that he would publicize his full involvement with RWI at an upcoming product launch.[50] Shortly before the November 2013 product launch, however, Jeter declared that he would not permit

---

[46] *Id.* at ¶¶ 108–09.
[47] *Id.* at ¶ 110.
[48] *Id.*
[49] *Id.* at ¶ 84.
[50] *Id.*

RWI to disclose his full involvement with the Company at the event.[51] Instead, at the product launch, Jeter merely stated: "I'm supporting my man, Mathias Ingvarsson. He gave me this product and I fell in love with it."[52] Moreover, rather than fulfill the Company's expectations, RWI asserts that Jeter used the product launch to promote his new publishing venture.[53]

The Counterclaimant alleges that investors invested significant funds in RWI based upon Jeter's false representations regarding a public announcement.[54] Shortly after the November 2013 product launch, RWI explains that investors became upset with Jeter and the Company because it was clear that Jeter would not state publically that he was a co-founder, substantial owner, and director of RWI, thereby inhibiting its ability to raise necessary funds.[55]

*E. Jeter's Plan to "Take Over" RWI*

RWI alleges that Jeter's ultimate plan was to purposefully reduce the value of the Company in hopes of later obtaining control. In the midst of the Company's financial hardship in early 2014—a direct result of Jeter's "misconduct," according to the Counterclaimant—Jeter and his representatives brought in Mary Gleason as an outside consultant to assist RWI in licensing the FRIGO brand.[56] As RWI

---

[51] *Id.* at ¶ 86.
[52] *Id.* at ¶ 87.
[53] *Id.* at ¶ 88.
[54] *Id.* at ¶ 111.
[55] *Id.* at ¶¶ 115–16.
[56] *Id.* at ¶ 118.

11

explains, Jeter and his representatives wanted Gleason to "take over" RWI's management.[57] According to RWI, Jeter and his representatives, without the authority of the RWI board, instructed Gleason to run the Company and the FRIGO brand.[58] Jeter's alleged efforts, RWI contends, caused "great confusion" within the Company, as well as "significant financial harm."[59] There is no indication in the Counterclaims, I note, that Gleason did, in fact, control the Company's management.

Finally, RWI alleges that in late 2014, Jeter attempted to become the Company's largest stockholder in an attempt to capitalize on RWI's financial suffering. According to RWI, one of the Company's co-founders sought to sell shares of stock representing approximately 10% of RWI.[60] Through his representatives, Jeter "demanded" the opportunity to purchase the shares, which would have made him the Company's largest stockholder at approximate 25%.[61] RWI, however, "refused" to sell the shares to Jeter.[62] Instead, another investor ultimately purchased the shares and Jeter remained a 15% owner.[63]

According to the Counterclaims, Jeter desired full control of the Company because his plan had always been to either own his own clothing brand or, upon

---

[57] *Id.* at ¶ 119.
[58] *Id.* at ¶ 120.
[59] *Id.* at ¶ 123.
[60] *Id.* at ¶ 146.
[61] *Id.* at ¶¶ 148–49.
[62] *Id.* at ¶ 150.
[63] *Id.* at ¶¶ 149–50.

12

seizing control of RWI, transferring its patented technology to a sports apparel company, such as Nike, to incentivize a long-term endorsement deal.[64]  Based on the pleadings, Jeter's "plan" failed as he never obtained control of the Company.  Ultimately, Jeter's directorship ended on July 22, 2015.[65]

*F. Procedural History*

Jeter filed a Verified Complaint on November 13, 2015 and a Verified Amended Complaint on November 25, 2015, alleging three counts.  In Count I, Jeter sought a declaration that he had fully complied with, and performed under, the Director Agreement.  In Count II, Jeter sought a declaration that he was entitled to indemnification and advancement.  In Count III, Jeter sought an order compelling the inspection of the Company's books and records.  Counts II and III have since been resolved by the parties.  Count I remains to be litigated and is not at issue in this Memorandum Opinion.

RWI filed its Answer and Counterclaim on December 14, 2015 and its Amended Answer and Counterclaim on February 16, 2016.  Generally, RWI asserts that Jeter initially represented, and continued to represent, that his Nike contract

---

[64] *Id.* at ¶ 142.

[65] The Plaintiff's (Counterclaim-Defendant's) Complaint asserts that "by letter dated July 22, 2015, Jeter resigned as director of the Company, effective immediately."  Compl. ¶ 27.  In its Answer, however, RWI "denies Plaintiffs' characterization of [that] document[]," explaining that its "terms speak for themselves."  Countercls. 17.  Furthermore, RWI contends that it is "without knowledge or information sufficient to form a belief as to the truth of Jeter's reasoning for sending the July 22, 2015 letter," and on that basis denies the Plaintiff's averments.  *Id.*  Nonetheless, it appears from the briefs and oral argument that Jeter is no longer a director of the Company.

13

would allow the Company to publically announce his role as a co-founder, substantial owner, and director. Based on Jeter's actions and later representations, however, RWI contends that Jeter's representations were false. RWI alleges five counts in which it asserts that Jeter's actions support claims of fraud, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duties. In relief, RWI seeks, among other things, compensatory damages of no less than $30 million and rescission of the Director Agreement.

On February 19, 2016, Jeter moved to dismiss RWI's Counterclaims pursuant to Court of Chancery Rule 12(b)(6). Following briefing on the motion, I heard oral argument on April 21, 2016. This is my Memorandum Opinion.

## II. ANALYSIS

The Plaintiff and Counterclaim-Defendant move to dismiss the Counterclaims under Court of Chancery Rule 12(b)(6) on the ground that the Counterclaims fail to state a claim upon which relief may be granted. When considering a motion to dismiss under this rule, I must accept all well-pled factual allegations as true and draw all reasonable inferences in favor of the non-movant—the Defendant and Counterclaimant here.[66] The Court need not, however, accept conclusory allegations unsupported by specific facts.[67] The motion will be denied unless the non-movant

---

[66] *Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *3 (Del. Ch. Jan. 13, 2014) (citations omitted).
[67] *Id.*

14

"could not recover under any reasonably conceivable set of circumstances susceptible of proof."[68]

The Counterclaimant has alleged five causes of action, some of which are related and are thus analyzed together. I address the motion as to each count below, finding that it must be granted in part and denied in part.

*A. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing*

In Count II, the Counterclaimant alleges that Jeter breached the implied covenant of good faith and fair dealing within the Director Agreement by refusing to issue a press release announcing his role as a significant owner, co-founder, and director of RWI. In addition, the Counterclaimant alleges that Jeter breached the implied covenant by stating at the November 2013 product launch that he was there as Ingvarsson's friend. Based on the following analysis, the Counterclaimant's latter allegation fails to state a claim and must be dismissed. Its former allegation, however, survives the motion.

Assessing the implied covenant of good faith and fair dealing is a "cautious enterprise."[69] In Delaware, the implied covenant inheres to every contract.[70] To

---

[68] *Id.*

[69] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

[70] *Peco Logistics, LLC v. Walnut Inv. Partners, L.P.*, 2015 WL 9488249, at *11 (Del. Ch. Dec. 30, 2015) (citing *Great–West Investors LP v. Thomas H. Lee Partners, L.P.*, 2011 WL 284992, at *14 (Del. Ch. Jan. 14, 2011)).

successfully plead a breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[71] The Court will not imply contractual terms, however, when the dispute at issue is expressly addressed by the terms of the contract.[72] Further, the implied covenant will only engage when "the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[73] Finally, "[w]hen conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal."[74]

### 1. Jeter's Refusal to Issue a Press Release

The Counterclaimants' first allegation is that Jeter breached the implied covenant of good faith and fair dealing by refusing to issue a press release announcing his role as a significant owner, co-founder, and director of the Company. Jeter moves to dismiss RWI's claim for three reasons: (1) the Director Agreement

---

[71] *Id.* (citing *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).
[72] *Sanders v. Devine*, 1997 WL 599539, at * 6 (Del. Ch. Sept. 24, 1997) ("[T]he law is settled that where the terms of a contract expressly address the terms of a dispute, those express contractual terms-not an implied covenant of good faith and fair dealing-govern the parties' relations.") (citations omitted).
[73] *Nemec*, 991 A.2d at 1126 (citing *Dunlap*, 878 A.2d at 442).
[74] *Id.* (citations omitted).

16

expressly covers the issuance of a press release, leaving no room for operation of the implied covenant; (2) RWI is precluded from relying on the implied covenant, since it could have reasonably anticipated the current issues when negotiating the Director Agreement and thus could have negotiated for a contractual provision that it now seeks to imply; and (3) Jeter's alleged refusal to issue a press release could not frustrate the overall purpose of the Director Agreement, and thus does not implicate the implied covenant. I have already explained that this Court regards appeals to the implied covenant with a gimlet eye, lest its application frustrate, rather than perfect, the parties' intentions as explicitly stated in the contract. Here, however, Jeter's concession at oral argument alleviates the need for such scrutiny.

I turn first to the pertinent contractual provision in the Director Agreement. Attached to the Director Agreement is Exhibit E, titled "Specific Services to be Provided by Director." Exhibit E provides, in part, that "RevolutionWear may issue a press release disclosing [the] Director's role with RevolutionWear provided that Director approves the press release in advance."[75] RWI's ability to issue a press release is, accordingly, conditioned on Jeter's approval. RWI contends that, implied in this condition, is the requirement that Jeter not withhold approval unreasonably. I need not decide, and specifically decline to decide, whether under the facts as pled, the *implied covenant* should attach to impose an objective good-faith or

---

[75] Director Agreement, Ex. E.

17

reasonableness requirement here, because the issue has been conceded by Jeter. At oral argument, counsel addressed the intentions of the parties as provided for in this section. The parties, including Jeter through his counsel, agreed that a "reasonableness" requirement attaches and must be imputed to Jeter's approval of a press release.[76] In other words, Jeter concedes that the terms of the Director Agreement, including any term implied by the covenant of good faith and fair dealing, provide that he may only reject a proposed press release if his rejection is *reasonable* and not arbitrary. Given this concession, I need not further scrutinize the contract in light of the implied covenant. As the parties have agreed, Jeter will have breached the Director Agreement, and thus deprived RWI of the fruits of its bargain, if Jeter *unreasonably* refused to approve the issuance of a press release. The remaining issue before me in this regard, therefore, is whether Jeter's refusal to issue a press release was *reasonable,* as required by the Director Agreement.

In its Counterclaims, RWI alleges that, after many failed requests that Jeter approve a press release, RWI proposed a formal press release in September 2014 (the "Proposed Press Release").[77] Although RWI failed to submit the Proposed Press Release as part of its pleadings, the Counterclaimant represents that it would have announced that Jeter was a co-founder, significant owner, and director of RWI in

---

[76] Oral Arg. Tr. 24:1–30:1, 39:5–41:24, 70:22–72:11.
[77] Countercls. ¶ 131.

18

furtherance of the Company's reverse-endorsement strategy.[78] Jeter, upon RWI's request for approval of the Proposed Press Release, withheld his approval and instead approved the following statement:

> FRIGO® is a brand I am excited about because of their innovation and patented technology. I was introduced to FRIGO® when it was a prototype and believe it fills a void in the marketplace. I am looking forward to seeing its continued progress, thanks to the hard work of the RevolutionWear team, led by founder and CEO Mathias Ingvarsson.[79]

That official statement, according to RWI, falls short of a disclosure of Jeter's full role at RWI as contemplated by Exhibit E of the Director Agreement, which was bargained for in aid of the reverse-endorsement strategy. Moreover, RWI asserts that Jeter's refusal to disclose his role with the Company was unreasonable and thus violated Exhibit E. Jeter's refusal to approve the Proposed Press Release, RWI explains, was either arbitrary or driven by an undisclosed provision of Jeter's Nike contract precluding such disclosure. The latter explanation, if true, would be unreasonable, RWI argues, because at the time of contracting, Jeter represented that his Nike contract included a carve-out that allows Jeter to issue a press release that publically announces his role as a co-founder, significant owner, and director of RWI. Otherwise, according to RWI, Jeter had no legitimate reason for refusing the Proposed Press Release and such a refusal is, therefore, arbitrary.

---

[78] *Id.*
[79] *Id.* at ¶ 132.

Based on the pleadings, I find that it is reasonably conceivable that Jeter's refusal to approve the Proposed Press Release was not reasonable and thus his refusal is a breach of the Directors Agreement. To the extent Jeter refused to approve the Proposed Press Release because of its potential conflict with his Nike contract, his refusal frustrated the overall purpose of the Director Agreement as determined at the time of contract, contradicts his representation concerning a carve-out, and is therefore conceivably unreasonable. If Jeter's decision to withhold approval of the Proposed Press Release was not based on the Nike contract, it is reasonably conceivable that his refusal was arbitrary and thus unreasonable. The motion to dismiss is accordingly denied as to that portion of Count II.

### 2. Jeter's Statements at the 2013 Product Launch

The Counterclaimant also alleges that the implied covenant of good faith and fair dealing was breached by Jeter's statements at the November 2013 product launch in which he stated that he was at the launch as Mr. Ingvarsson's friend. Specifically, at the November 2013 product launch, Jeter stated: "I'm supporting my man, Mathias Ingvarsson. He gave me this product and I fell in love with it." According to RWI, Jeter's statements are false and are another example of an arbitrary and unreasonable refusal by Jeter to announce his full role with the Company in violation of the Director Agreement.

This portion of RWI's claim fails to state a cause of action. My understanding

20

of RWI's claim is that the necessary implication of Jeter's statements is that he was *only* at the product launch to "support [his] man, Ingvarsson" and was not at the event, therefore, as a co-founder, director, and substantial owner. It is not reasonably conceivable, however, that Jeter's statements at the November 2013 product launch equate to an unreasonable refusal to issue a press release as contemplated by Exhibit E. Jeter's statements were not categorical as characterized by the Counterclaimant: Jeter did not say that his *sole* purpose for attending the event was to support Ingvarsson. Jeter's statements are silent as to any official role with RWI and do not create an implication that Jeter has no other role with the Company. Moreover, Exhibit E contemplates a *press release*, and not some other type of an announcement, such as an interview at a product launch party. The parties' agreement makes clear, in fact, that Jeter does *not* have a duty to promote the company or its products, beyond not unreasonably interfering with the specified press release addressed above.[80] Therefore, this portion of Count II is dismissed.

### B. Counts I, III, & V: Fraud-Based Claims

RWI alleges three counts based in fraud: fraudulent inducement (Count I), fraudulent concealment (Count V), and fraud (Count III). In order to sufficiently plead a fraud claim, the plaintiff must allege:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the

---

[80] *See* Director Agreement § 6.

21

representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[81]

In addition, Court of Chancery Rule 9(b) requires that the claimant state with particularity the circumstances constituting fraud.[82]  Specifically, fraud claims must be pled with particularity concerning:  "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[83]

The Counterclaimant's claims for fraudulent inducement and fraudulent concealment are intertwined.  I thus analyze those claims together and find that each claim survives the motion to dismiss.  I then turn to the Counterclaimant's separate count for fraud, finding that it is dismissed because the count fails to state a separate claim of fraud.

### 1. Fraudulent Inducement and Concealment

In Count I, the Counterclaimant alleges that RWI was fraudulently induced by Jeter into entering the Director Agreement.  It asserts that Jeter fraudulently induced RWI to enter into the Director Agreement by falsely representing to the

---

[81] *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *7 (Del. Ch. May 30, 2014) (citing *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

[82] Ct. Ch. R. 9(b).

[83] *Eurofins Panlabs, Inc.*, 2014 WL 2457515, at *7 (citing *Abry Partners V, L.P.*, 891 A.2d at 1050).

Company that he had "explicit, written approval from Nike to announce, and allow RWI to announce, that Jeter was a co-founder, substantial owner and director of RWI."[84] Thereafter, as alleged in Count V, RWI argues that Jeter concealed its fraud. According to RWI, Jeter "actively concealed the truth about the Nike contract by affirmatively making statements to RWI . . . that he would allow the public announcement of his role as director, co-founder and significant owner of RWI," and that such acts "prevented RWI from gaining knowledge of material facts concerning the truth about the Nike contract and led RWI astray from the truth."[85] The Counterclaim-Defendants contend that the fraudulent inducement and fraudulent concealment claims should be dismissed on two grounds: first, they argue that the fraudulent inducement claims are time-barred; second, they contend that RWI fails to sufficiently allege the falsity of the statements regarding Jeter's Nike contract. I conclude that the Counterclaimant's claims for fraudulent inducement survive the motion to dismiss. I start with the Counterclaim-Defendant's assertion that the fraudulent inducement claims are untimely.

In Delaware, claims based in fraud are subject to a statute of limitation of three years.[86] Generally, "the cause of action accrues at the time of the alleged wrongful

---

[84] Countercls. ¶ 152.
[85] *Id.* at ¶ 197.
[86] 10 *Del. C.* § 8106.

23

act, even if the plaintiff is ignorant of the cause of action."[87] Here the alleged contract-inducing misstatements were made to induce RWI to enter the Director Agreement in 2011. The Counterclaims assert that on February 17, 2011, VanEgmond spoke with Kinda Younes, an officer of RWI, and represented that Jeter had received written permission from Nike to be a publically announced co-founder, substantial owner and director of RWI.[88] On that same day, VanEgmond also made a similar representation to Ingvarsson.[89] According to RWI, VanEgmond's representations were false and were knowingly made on behalf of Jeter to induce RWI to enter the Director Agreement. Earlier in this litigation, before the Counterclaims were amended, Jeter denied that RWI's pleadings were sufficient to allege VanEgmond was acting as his agent in dealing with RWI, but in briefing this motion Jeter has dropped that assertion, based upon what he describes as RWI's "more fulsome" pleadings.[90] RWI's original counterclaims were filed on December 14, 2015, nearly five years after the alleged misstatements by Jeter's agent. It therefore follows, according to the Counterclaim-Defendants, that the fraud-based counterclaims should be dismissed as they were filed outside the three-year statute

---

[87] *Seiden v. Kaneko*, 2015 WL 7289338, at *7 (Del. Ch. Nov. 3, 2015) (citations omitted).

[88] Countercls. ¶ 66.

[89] *Id.* at ¶ 67.

[90] *See* Pl's Opening Br. 30 n.12. I hereby renounce, in defeat, a pedantic pet peeve: I confess that in today's United States, 'fulsome' is a sesquipedalian synonym for 'full,' Mr. Webster's dictionary be damned. I give up, I give in, I yield to the majority; I will no longer be stuck in fulsome prison.

of limitation.

RWI's claim of fraudulent inducement must be measured in light of its claim of fraudulent concealment, however. According to RWI, Jeter's fraudulent concealment tolls the statute of limitation until November 2013, at which time it received an email from Close revealing Jeter's fraudulent inducement. In order to toll the statute of limitation under the fraudulent concealment exception, "the plaintiff must allege some affirmative act by the defendant 'that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth.'"[91] When the exception is satisfied, the statute will be tolled and will not begin to run until the "discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which if pursued, would lead to the discovery [of the injury]."[92]

In Count V, RWI alleges that Jeter concealed the truth concerning the fraudulent representations—that Jeter's Nike contract did not preclude a public announcement of his role with the Company—by "affirmatively making statements to RWI while he was a director of RWI that he would allow the public announcement of his role as director, co-founder and significant owner of RWI."[93] In other words,

---

[91] *Smith v. Mattia*, 2010 WL 412030, at *5 (Del. Ch. Feb. 1, 2010) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007)).
[92] *Id.* at *4 (citing *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778–79 (Del. Ch. 2007)).
[93] Countercls. ¶ 195.

following the fraudulently induced execution of the Director Agreement, Jeter allegedly continued to represent to RWI that he could (and would) publically announce his role with the Company as co-founder, substantial owner, and director, thereby concealing the fact that his Nike contract provided otherwise. For example, RWI alleges that in or about November 2012, Jeter stated to RWI that if it changed the style of the product from a sports undergarment to a fashion undergarment that he would "fully support RWI and publically announce that he was a co-founder, substantial owner and director."[94] According to RWI, Jeter's continued representations prevented RWI from gaining knowledge of the falsity of the alleged fraudulent statements and that, as a result, RWI continued to devote significant resources, funds, and time to developing the reverse-endorsement plan around Jeter. It was not until Close's email of November 13, 2013—written over two years after Jeter executed the Director Agreement—that RWI discovered the falsity of VanEgmond's representations. According to RWI, Close's email informed Ingvarsson that because of Jeter's Nike contract, "there will be no mention of Derek's presence in the marketplace."[95] Moreover, RWI explains that it could not have discovered the truth concerning the Nike contract because at all times, Jeter's Nike contract was in the sole possession of Jeter and his agents, who have refused

---

[94] *Id.* at ¶ 77.
[95] *Id.* at ¶ 69.

to provide a copy to RWI.

Jeter, on the other hand, contends that RWI's fraudulent inducement claim is not subject to equitable tolling. According to Jeter, RWI was aware, or should have been aware, of facts sufficient to put the Company on inquiry notice that Jeter's representations regarding the Nike contract were false. Jeter's agents' repeated refusal to provide the Nike contract, Jeter explains, should have deterred RWI from moving forward with Jeter and should have provoked further investigation into the contents of the Nike contract. Therefore, it would follow, RWI failed to perform reasonable diligence to investigate the contents of the Nike contract and should thus not benefit from equitable tolling. Jeter's argument assumes, however, that it was unreasonable for RWI to trust Jeter's agents' repeated representations that Jeter's Nike contract did not serve as an impediment to the reverse-endorsement strategy. I cannot make that fact-based assumption at this stage of the litigation. Jeter's argument cannot, therefore, serve as a basis to dismiss RWI's claim.

Jeter asserts a second rationale for barring equitable tolling here. Jeter contends that tolling of the statute of limitations is inappropriate because RWI has admitted that Close read the relevant provisions of the Nike contract, or the carve-out, to RWI on September 15, 2011, at which point RWI must have known the truth of the matter. Jeter's argument, however, borders on tautology: it ignores the fact that RWI's claim contemplates that Jeter's representatives read something other than

27

the *actual* provisions of the Nike contract—that is, that the purported reading was a lie to further the fraud. Therefore, at this stage of the litigation, Jeter's agent's reading of what he purported to be the relevant provisions of the Nike contract do not preclude the equitable tolling of RWI's fraudulent inducement claim.

Based on its pleadings in Counts I and V, therefore, it is reasonably conceivable that RWI's fraud claims are timely because Jeter fraudulently concealed the preclusive contents of his Nike contract, thereby tolling the statute of limitations until November 2013. Accordingly, Count I cannot be dismissed on the ground that it was untimely.

The Plaintiffs second argument in support of dismissal of RWI's fraudulent inducement and fraudulent concealment claims is that RWI has failed to sufficiently state that the representations regarding the Nike contract were false. According to Jeter, RWI never pleads that it "discovered that any of the alleged statements or representations were false," and that RWI instead "assumes that [the] alleged statements must have been false . . . because Jeter later refused to make a public announcement."[96] Moreover, Jeter argues that RWI admits that it was free to publicly announce Jeter's role without Jeter's permission and, in fact, shot a video with Jeter to show to investors in which Jeter stated that he was involved with RWI as an investor, co-founder, and board member. While RWI's fraud claims appear

---

[96] Defs' Opening Br. 34.

weakened by various admissions in its pleadings, RWI nonetheless sufficiently alleges that Jeter's representations regarding his Nike contract were false. Specifically, RWI points to Close's representation in his November 2013 email that Jeter's "presence in the marketplace" could not be disclosed due to his Nike contract. Therefore, RWI has sufficiently pled falsity in support of its fraudulent inducement and concealment claims.

Based on the foregoing, the motion is denied as to Counts I and V.

### 2. Fraud

In Count III, RWI alleges a separate claim of fraud that resembles an amalgamation of its claims of fraudulent inducement and concealment. In its fraud claim, RWI alleges that Jeter made "knowing false statements to RWI that he would publically announce that he was a co-founder, substantial owner and director of RWI,"[97] and that "these statements were false, because, upon information and belief, Jeter could not make such announcements due to the Nike contract."[98] RWI explains that "Jeter used these fraudulent statements to induce RWI into spending substantial money, time and effort into creating the reverse-endorsement plan around Jeter and changing its product and marketing to his personal liking to please Nike."[99]

I find that RWI has failed to identify statements that contributed to fraud that

---

[97] Countercls. ¶ 173.
[98] *Id.* at ¶ 174.
[99] *Id.* at ¶ 175.

RWI relied on to its detriment separate from those statements made to allegedly fraudulently induce the Director Agreement and fraudulently conceal their falsity. To the extent RWI has alleged statements that I have not identified here that have contributed to RWI's continued reliance on Jeter's initial fraudulent statements, any related claim for fraud is subsumed by the surviving counts for fraudulent inducement and concealment. As a result, an additional, distinct claim of fraud is not present in the Counterclaims.[100] The motion to dismiss is accordingly granted as to Count III.[101]

### C. Count IV: Breach of Fiduciary Duties

In Count IV, RWI asserts several allegations that Jeter acted in bad faith and in violation of the duty of loyalty. It alleges that Jeter breached his fiduciary duties in seven ways: (1) making fraudulent statements to RWI and RWI's investors; (2) using the November 2013 product launch to promote a separate business interests; (3) causing RWI to alter the FRIGO product and marketing strategy to fit Jeter's personal liking in return for his false promise that he would publically announce his role with RWI; (4) demanding that RWI not pursue a certain branding strategy that

---

[100] I note that RWI seeks monetary damages in relief for its fraud claim in Count III. RWI also seeks monetary damages, in addition to rescission, in relief for its fraudulent inducement claim in Count I.

[101] The Counterclaim-Defendants argue that RWI's fraud claim must be dismissed because RWI improperly "bootstrapped" a contract claim into a fraud claim. Because I've found that RWI's fraud claim must be dismissed for failure to state a claim, I need not determine whether RWI's fraud claim is improperly duplicative of a breach of contract claim.

the board had already agreed to pursue; (5) attempting to take over the management of RWI; and (6) attempting to capitalize on RWI's financial suffering by buying additional shares of RWI at a depressed price to become the largest stockholder of RWI.[102]

The Company's Certificate of Incorporation, I note, includes an exculpatory clause that absolves a director of liability to the Company for monetary damages "[t]o the fullest extent permitted by law."[103] In order to withstand a motion to dismiss, therefore, the allegations against Jeter must make it reasonably conceivable that Jeter has breached a non-exculpated duty: the fiduciary duty of loyalty.[104] This Court has held that "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[105] Accordingly, "Corporate fiduciaries 'are not permitted to use their position of trust and confidence to further their private interests'"[106] in ways inimical to the corporation. Encompassed within the duty of loyalty is the requirement that

---

[102] Countercls. ¶ 188.

[103] Pls.' Opening Br., Ex. A, at 17.

[104] *In re Alloy, Inc.*, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011) (explaining that "if the corporation's certificate contains an exculpatory provision pursuant to § 102(b)(7) barring claims for monetary liability against directors for breaches of the duty of care, the complaint must state a nonexculpated claim, *i.e.*, a claim predicated on a breach of the directors' duty of loyalty or bad faith conduct")) (citing *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239–40 (Del. 2009).

[105] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[106] *Id.* (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

a director act in good faith.[107] Although the duty to act in good faith may be invoked with regard to a variety of behavior,[108] RWI contends that it has pled a breach of the duty to act in good faith by showing that Jeter "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation."[109]

RWI's allegations, in my mind, illustrate the difficulties that may arise in the fiduciary duty context when a corporation expects its directors to perform acts outside of their traditional fiduciary role. Here, for example, the purpose of Jeter's membership on RWI's board was essentially for marketing purposes: the Company hoped that consumers would recognize Jeter's role on the board, and his substantial investment in the Company, and be persuaded thereby to purchase its product. The Director Agreement, therefore, contains certain provisions to facilitate RWI and Jeter's "reverse-endorsement" strategy that obligate Jeter beyond his fiduciary obligations. Specifically, the Director Agreement contemplates a press release announcing Jeter's role with the Company, as well as a biographical sketch to be

---

[107] *See Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006) ("The failure to act in good faith may result in liability because the requirement to act in good faith 'is a subsidiary element[,]' i.e., a condition, 'of the fundamental duty of loyalty.'") (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)).

[108] *See e.g.*, *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (describing examples of bad-faith acts, such as "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties") (citations omitted).

[109] *In re Rural/Metro Corp S'holder Litig.*, 102 A.3d 205, 253 (Del. Ch. 2014) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

disclosed in the context of information about RWI's management.[110]  While such

contractual obligations may give rise to breach-of-contract claims, they do not alter

the fiduciary obligations of the director.  Here, it appears that Jeter's contractual

obligations have enlarged the Company's expectations of Jeter beyond his fiduciary

obligations.  For this reason, all but the claim that Jeter made false statements to

investors must be dismissed for failure to state a claim.  I address each of RWI's

allegations in turn below. I note at the outset, however, that (with the exception of

the misrepresentation to investors and actions at the November 2013 product launch,

addressed directly below) RWI's claims of breach of duty, ironically, involve Jeter

acting like a director of the Company, and not like the promoter manqué that RWI

apparently intended he be.

### 1. Allegation 1:  Misrepresentations to Investors

In RWI's first allegation, it asserts that Jeter made fraudulent statements to

RWI and RWI's investors.  RWI explains that on multiple occasions, Jeter

represented to RWI investors that he would publically announce his role as a co-

founder, investor, and director of RWI.  It points to statements made in Stockholm,

Sweden in November 2011, and in Tampa, Florida in January 2012.  In reliance on

those representations, RWI explains, investors made significant investments in the

Company.  Jeter, however, knew he was unable to comply, because he was

---

[110] *See* Director Agreement, Ex. E; *id.* § 7.

33

(allegedly) contractually prohibited from doing so under his contract with Nike. After Jeter inevitably reneged on his obligation to RWI, those investors became unhappy with RWI and lost faith in the Company. As a result, RWI asserts, the Company was unable to raise the necessary funds to implement its business plans.

Assuming, as I must at this stage, the truth of RWI's pleadings, Jeter's statements to investors, made to encourage investment and knowingly false, were made in bad faith, and RWI's allegation, therefore, sufficiently pleads a claim of breach of fiduciary duty. Jeter, while acting as a fiduciary to the Company, made statements that were knowingly false and caused investors to invest in the Company. After discovering the falsity of Jeter's statements, investors lost faith in the Company, thereby limiting the Company's ability to raise capital. Based on RWI's allegations, Jeter acted with a purpose other than that of advancing the best interests of the Company. The motion as to the first allegation, therefore, is denied.

### 2. Allegation 2: Promotion of Other Interests

In RWI's second allegation, it asserts that Jeter breached his duty of loyalty and acted in bad faith by using the November 2013 product launch to promote a separate business interests. Specifically, RWI points to statements Jeter made at the product launch in which he described a recent opportunity to enter the publishing business. This allegation fails to state a breach of the fiduciary duty of loyalty and does not amount to a bad faith act as pled.

34

Assuming for the purposes of this analysis that Jeter attended the November 2013 product launch and promoted a business other than the Company, the fiduciary duty of loyalty does not preclude a director from discussing other business ventures at a promotional event that he has no fiduciary obligation to facilitate or even attend. RWI's allegation, as I see it, is merely another iteration of its contract and fraud claims. RWI expected that at the November 2013 product launch, Jeter would publically announce that he was a co-founder, substantial owner, and director of RWI. Instead, Jeter stated only that he attended the product launch to support Ingvarsson and the product. While Jeter's discussion of his other business interest may have offended RWI's expectations, such expectations are based in contract and cannot state a claim for breach of fiduciary duty. The statements regarding the publishing venture, as opposed to Jeter's failure to disclose his role, are not alleged to have harmed the Company. Accordingly, it is not reasonably conceivable that RWI will prevail, and the motion is granted as to RWI's second allegation.

### 3. Allegations 3 & 4: Influence on Marketing Strategies

In RWI's third allegation, it asserts that Jeter breached the fiduciary duty of loyalty and acted in bad faith by causing RWI to change the FRIGO product and marketing strategy to his "personal liking" in return for his false promise that he would publically announce his role with RWI. Similarly, in its fourth allegation, RWI alleges that Jeter "demanded" that RWI halt a branding strategy that had been

35

approved by the board in favor of his own strategy. Both of RWI's allegations fail to state a claim of breach of the fiduciary duty of loyalty and do not arise to bad faith acts.

In the Counterclaims, RWI states that Jeter insisted that the FRIGO product was "too sporty," allegedly because, unless the products were redesigned as "fashion" undergarments, his relationship with Nike could be damaged by the similarities between the FRIGO products and Nike products. According to RWI, VanEgmond informed Ingvarsson in November 2012 that Jeter would not publically support RWI if the FRIGO product remained "sporty." To save its relationship with Jeter, and thus preserve its "reverse-endorsement" strategy, RWI "redesign[ed] the message, packaging and product line, and changed the distribution plan, to make the product less 'sporty/athletic' and more of a fashion product."[111]

Later, in April 2013, RWI's board of directors approved a marketing campaign that featured a social media strategy spearheaded by Curtis James Jackson III, also known as the rapper 50 Cent.[112] Subsequently, however, Jeter objected to the strategy, causing RWI to abandon the effort. According to RWI, Jeter's obstruction caused "the waste of significant funds, time and effort, and caused RWI irreparable harm with retailers, customers and investors."[113]

---

[111] Countercls. ¶ 78.
[112] Id. at ¶ 98.
[113] Id. at ¶ 104.

According to RWI, Jeter's advocacy of changes to the Company's marketing strategy were not just bad business decisions made by a corporate fiduciary, but were acts made in bad faith, in breach of his duty of loyalty. RWI's Counterclaims, however, lack factual allegations sufficient to show that Jeter breached his fiduciary duties. Strikingly absent from RWI's Counterclaims is how Jeter was able to unilaterally alter the direction of the Company. RWI, for example, has not alleged that Jeter holds a controlling ownership interest in the Company or that he controls the board; it has not described how the Company implemented Jeter's bad-faith marketing decisions; and it has failed to allege whether RWI's officers and other directors supported or challenged Jeter's decisions. In sum, RWI has failed to allege how Jeter acted in breach of his fiduciary duty; instead, to the extent these allegations relate to any of RWI's claims, they seem to again converge with its contract and fraud allegations. While RWI's reaction to Jeter's demands may have relevance to the damages formulation with respect to its fraud or contract claims, they do not, as pled, implicate Jeter's fiduciary duties. Accordingly, the motion is granted as to RWI's third and fourth allegations.

### 4. Allegations 5 & 6: Efforts to Obtain Control

In its fifth allegation, RWI contends that Jeter attempted to take over the management of RWI; and in its sixth allegation, RWI asserts that Jeter attempted to capitalize on RWI's financial suffering by purchasing additional shares at a

depressed price pursuant to a plan to take control of the Company. According to RWI, Jeter acted in bad faith and in violation of the duty of loyalty that he owed RWI.

In its Counterclaims, RWI alleges that in early 2014, Jeter and his representatives hired an outside consultant to assist RWI in licensing the FRIGO brand. Jeter did not stop there, however. According to RWI, Jeter attempted to install the outside consultant as a "shadow director" and instructed the consultant to run the Company.[114] Although Jeter's efforts allegedly caused financial harm and great confusion within the Company, there is no indication that Jeter's plan was successful. Finally, in late 2014, after Jeter had "single handedly caused great financial harm to RWI, Jeter attempted to capitalize on RWI's financial suffering by buying additional shares of RWI at a reduced price [to] become, by far, the largest shareholder."[115] Ultimately, however, Jeter bought no additional shares.

RWI's allegations again fail to sufficiently describe the actions Jeter took as a fiduciary. Based on the Counterclaims, it is unclear how Jeter, a single director, was able to hire an outside consultant and give it clear instruction to "run the [C]ompany and the brand."[116] Similarly, the ultimate culmination of Jeter's alleged plan—to control the Company by purchasing RWI stock at a depressed price—also

---

[114] *Id.* at ¶ 122.
[115] *Id.* at ¶ 141.
[116] *Id.* at ¶ 120.

simply never occurred. Therefore, RWI's fifth and sixth allegations do not support a claim for breach of fiduciary duty and are dismissed.

### III. CONCLUSION

Based on the foregoing, the motion to dismiss is denied as to the Counterclaimant's counts for fraudulent inducement (Count I) and fraudulent concealment (Count V). Likewise, the motion is denied as to the noted portions of the counts for breach of the implied covenant of good faith and fair dealing of the Director's Agreement (Count II) and breach of fiduciary duties (Count IV). The motion is otherwise granted. The parties should submit a proposed order consistent with this Memorandum Opinion.